# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

ELIZABETH MARTIN and )
KELLY FOLSOM, )
          )
   Plaintiffs, )
          )
v. )  Case No. CIV-06-188-KEW
          )
THE WEYERHAEUSER COMPANY, )
          )
   Defendant. )

## OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment filed January 25, 2007 (Docket Entry #39). This Motion is at issue, having had a timely response and reply filed in relation to it. Upon review and consideration of these documents, this Court renders this ruling.

**Facts Relating to Plaintiff Elizabeth Martin**

Defendant employed Plaintiff Elizabeth Martin ("Martin") at its Valliant Mill facility located in Valliant, Oklahoma in August of 2001 as a Senior Environmental Engineer, focusing on air and water quality management. Martin was at all times relevant to this case an at-will employee of Defendant with no contract.

The first incident identified by Martin in response to which she alleges Defendant retaliated against her involves the alleged draining of water by Defendant without a required environmental permit. Martin contends she reported she was concerned about stormwater runoff in an area where trailers were parked. Martin states the area did not drain to the wastewater treatment system

but rather drained into an area for which Defendant did not have a required stormwater permit. She voiced her concerns with managers for Defendant. Martin contends several months passed with no action taken by Defendant to resolve the problem. Martin raised the issue again and an engineering meeting was held where it was discussed that the location of the trailers was essential for production. It was determined Defendant would either re-grade the area so that a permit would not be required or get a stormwater permit, with a preference for the former. An engineer would come up with a plan for reshaping the area so that it would drain differently. Two or three weeks passed whereupon Martin checked with the engineers on the progress of the project. Martin states she learned there were no plans to re-grade the area and no permit had been obtained. She states she believes her continued questioning on this issue, which occurred within a few days before Defendant's Valliant facility went through a forced ranking system that year, led to retaliation against her in that ranking. Martin does not know if or how the wastewater issue was resolved.[1]

The second incident for which Martin alleges she suffered retaliation in her employment with Defendant occurred when she expressed concern over the amount of visible oil in the wastewater in the sewers of the paper mill, oil spills on the floor in the

---

[1] In her deposition testimony, Martin does not identify specific time periods when events occurred other than contending they happened within close proximity to retaliatory actions taken against her.

basement of the paper mill. Martin claims issues surrounding the oil/water separator had gradually developed and lingered for some time. Management and Martin discussed the issue in the morning production meeting and training was conducted on the applicable regulations. Martin admits the oil issue is complicated to resolve. She does not know if the issue has been resolved. Martin contends she suffered an adverse employment action because she continued to bring up the oil issue. Her basis for this contention is timing. Martin does not claim she was retaliated against for refusing to engage in illegal activity.

The third issue which Martin contends led to retaliation against her concerned trials. Martin states that from time to time Defendant tried to develop new products or improve existing processes. Martin's role in such trials was to assess the environmental impact associated with the new product or improvements. Company policy required such a study to be conducted in conjunction with a new product or method of improving an old product. Martin's evaluation would include determining if permits would be required for the new product or process, whether the wastewater treatment system would need expansion to accommodate it, and whether any other safeguards might be required.

Oftentimes, Martin found it difficult to obtain additional information on a project from Defendant when she felt she needed it. She was reluctant to sign off on such projects without what

she considered to be insufficient data. Martin often approved trials on a temporary basis. Martin believes bringing the need for additional information prior to approval met resistance from management. She believes "all of these things build on each other so that they, with time, decided to get rid of me." However, she is not aware that any of the trials resulted in an overload of the system prior to her leaving.

The fourth incident occurred in the late spring or summer of 2004 when Martin wrote a report concerning the production of excess hydrogen sulfide from the wastewater treatment system. Martin's report addressed certain upgrades that were needed in the system to address the hydrogen sulfide and other increasing load related issues. Martin perceives her report was not received well by management. Martin believes this report was a contributing factor in her termination because "the timing was about the same as the performance review, and I think all of these things fit together." Martin is not claiming she suffered an adverse employment action because Defendant required her to do something illegal with regard to the hydrogen sulfide issue. She is not aware of the actions taken, if any, as a result of her report.

Martin also identified an incident where plastic was found in the wastewater which put the plant in noncompliance with environmental standards. Defendant had informed the State of Oklahoma about the issue once, but Martin states the noncompliance

4

continued. Martin believed the issue needed further discussion and suggested that Defendant consider the possibility of a consent agreement. Martin testified management "didn't like the fact I had said that."

**Facts Relating to Plaintiff Kelly Folsom**

Defendant employed Plaintiff Mark Kelly Folsom ("Folsom") at its Valliant Mill facility located in Valliant, Oklahoma on August 7, 2001 as an environmental engineer, focusing on air quality. He was charged with the task of "making certain [Defendant] operated legally" and in compliance with all environmental laws and regulations. Folsom was at all times relevant to this case an at-will employee of Defendant with no contract.

Folsom testified he was qualified as a methionine reader in April of 2003 to determine bark boiler opacity. Defendant has a permit from the State of Oklahoma which describes the proper and acceptable parameters for particulates released into the air from the boiler which burns tree bark and natural gas to produce steam and power the Valliant Mill facility. Tree bark, although less expensive to burn, exacerbates the excessiveness of the opacity readings. The opacity is determined from the color of the smoke emanating from the smoke stack. Folsom monitored the opacity and advised the operator to make adjustments if it was outside of the parameters of the permit.

On two occasions, an operator complained about Folsom's

approach in raising the issue of opacity. Management counseled him concerning his "approach." If Folsom found Defendant was operating outside the parameters for opacity in its permit, Folsom was obligated to report the violation to the Oklahoma Department of Environmental Quality ("ODEQ"). Folsom could not recall if he reported the particular violations. Defendant did not tell Folsom not to report any violation to the ODEQ.

Folsom testified he was asked to minimize the opacity reporting on one occasion by reporting opacity as of the time of the official reading rather than when he observed the black trail of smoke emanating from the mill. However, he stated if he had not had the "interaction" with management regarding the reporting time, he "would have done it the same way that I did." Folsom also stated he did not believe he suffered direct retaliation as a result of this incident but that it was part of "a cumulative effect." Ultimately, Folsom's reporting was supported by other management, Kathryn Crenwelge.

Folsom stated over time he began to take a liberal approach with his opacity readings at the mill because management was downplaying the bark burning issue. He believed the mill was continuing to operate "close to the line" between compliance and non-compliance because the cost of burning bark was less expensive than natural gas. Because he raised the issue on multiple occasions, he believed his career was in jeopardy — thus, the

6

liberal approach to reporting. This approach involved declaring adverse readings as "unofficial" results so that they would not have to be reported. Folsom states he never falsified or failed to report an opacity violation while engaging in the "liberal approach."

Folsom's basis for fearing his job was in jeopardy was the "overall environment or mood in the plant created by Randy [Nebel] in his management style of managing by fear and intimidation." This environment was perceived by Folsom by "all the people that were laid off, all of the people that were fired and then particularly his comment during that one mill meeting when I had just had to call in a violation and have them back off and he turned right around and said burn more bark." Nebel did not tell employees to burn bark out of ODEQ compliance, but Folsom believed Nebel was not acting "in good faith."

Folsom also identified an incident where the opacity was elevated on a Friday afternoon. The next day at a meeting where Folsom reported the incident, a member of management asked Folsom if he was working with the operators to raise the bark burn rate. The manager did not request Folsom to have the operators burn bark so that the mill was out of compliance, but Folsom interpreted the comment as meaning just that.

The next issue for which Folsom claims he suffered retaliation concerned the operation of the thermal oxidizer. The thermal

oxidizer is an incinerator used to combust non-condensible gases, which is a byproduct of the pulping process. Folsom's concern was that the oxidizer was compliance tested for operating at about 2000 tons per day of pulp production and Randy Nebel was operating the mill production in excess of this amount. On May 12, 2003, Folsom told members of management, Kathryn Crenwelge, Kerri Reeves and Mike Wood about his concerns that the oxidizer was not compliance tested for the higher production rate. Mike Wood in the corporate office disagreed that the mill was out of compliance. Management did not criticize Folsom, request that he not bring up these issues, speak harshly to him or threaten his job. Folsom did not agree with their decision but concedes "they were playing in a grey area trying to justify what we were doing." Management did not request that he do something illegal. Again, Folsom believes this was part of the cumulative effect which lead to a retaliatory discharge.

Folsom also related an incident with Jeff Yoder, a manager at the mill. When the mill undertook a new capital project, a review is accomplished to insure that the project does not increase emissions beyond certain threshold values. This process is known as a prevention of significant deterioration review ("PSD"). In regard to one of these PSDs, Folsom inquired as to whether the particular project would increase production, to which a group headed by Yoder informed him it would not. Folsom believed an

increase in production was "obvious" so inquired for further information.  Yoder's group then reported a possible resulting increase in production.  Folsom believed Yoder and John Nash had lied to him.  He confronted John Nash about the matter and was told not to worry about it.  Once again, Folsom identified no specific retaliation but believed this incident was part of the "cumulative effect thing.  Just one more instance where [he] showed [his] willingness to butt heads with them."

The next incident which Folsom claims led to retaliation against him in his employment with Defendant involved a federal program identified as EPCRA.[2]  Folsom testified that under this program, the release of hazardous materials requires the immediate reporting within 24 hours to an emergency response line.  After an environmental audit in 2003, the regulation was discovered which required reporting under the EPCRA.  Folsom discussed the applicable regulations with management and Defendant's legal department.  Folsom recommended that the historical emissions be reported.  He was told it would be addressed in the future.  The retaliation suffered by Folsom was the "cumulative effect" with other issues he raised with management.  Folsom testified once again that the "cumulative effect" stemmed from the environment created by Randy Nebel "in which people were, were terminated on a

---

[2] The parties neither through evidence nor argument provide this Court with the precise identification of the program, other than the acronym of "ECPRA."

frequent basis." However, when pressed to cite specific examples of instances where an employee brought "unpleasant information to a supervisor" and was terminated, Folsom stated he had none "at this time."

Folsom also testified in his deposition of an issue involving a smelt dissolving tank. As described by Folsom, the process entails a tank where water is added to smelt for dissolving. A new program was going into effect which required the monitoring of the process for smelt dissolving tank scrubber flow rates. Folsom states Defendant's scrubber flow rates were too low in accordance with the rates established at the mill by Folsom and others. The low rates were to be reported in the next quarterly report. Folsom informed management of the need to report the emissions. Folsom was terminated before the quarterly report was due to be filed. Folsom checked on the reporting after he was terminated but the low flow rates were not reported. He does not know if it was reported later. He was not told that the mill was not going to report the flow rates, was not discouraged from raising the issue and was not required to provide false information to the ODEQ. According to Folsom, informing Defendant's management of this reporting requirement is part of the "cumulative effect" leading to retaliation against him.

Folsom next testified the mill was emitting excess hydrogen sulfide emissions from its waste water pipeline around the first of

August through mid-September of 2004. He learned of the excess emissions from Martin. He did not have the opportunity to speak with anyone associated with the mill about the emission, other than Martin, before he was terminated two days later.

The final issue which Folsom alleges lead to retaliation against him was when an opacity monitor was, in Folsom's opinion, in the wrong place in a stack. He does not know who was responsible for its placement or when it was installed, other than that installation occurred prior to his employment. Folsom questioned the location of the monitor with management in August or September of 2004. He was informed that the location was adequate. Folsom stated he did not have all of the data to determine the accuracy of the reported information. This instance is cited as another example of the "cumulative effect" of all of the occurrences where he raised unpleasant issues with Defendant.

**Facts Relevant to Both Plaintiffs**

On June 8, 2004, Plaintiffs each received a negative performance evaluation which placed them in the bottom tier of the salaried employees of the mill during the mill's forced ranking process. Each Plaintiff was placed on a 45-day performance improvement plan as a result of their rankings. These plans were extended. Both Plaintiffs were terminated by Defendant on September 29, 2004.

**Standard on Summary Judgment**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Universal Money Centers v. A.T. & T., 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed 2d 202 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. Applied Genetics v. Fist Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990); Posey v. Skyline Corp., 702 F.2d 102,

105 (7th Cir. 1983).

With regard to the material facts set forth above, this Court finds no significant dispute, since much of the evidence stems from Plaintiffs' depositions and affidavits. As a result, this Court must determine which party is entitled to summary judgment as a matter of law.

**Legal Requirements for Wrongful Discharge**

Plaintiffs' sole claim asserted in this case is one for wrongful discharge as against public policy under Oklahoma case authority. It is admitted that Plaintiffs were at-will employees of Defendant and only a public policy exception to that status will confer protection against termination to Plaintiffs. The public policy exception was first carefully crafted under Oklahoma law in the case of Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989). While holding that not every at-will employment arrangement gives rise to an implied covenant of good faith and fair dealing, the Oklahoma Supreme Court in Burk concluded that a public policy exception would be recognized when "the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law." Id. at 28. The exception, however, is to be "tightly circumscribed." Succinctly stated, the termination becomes actionable "where an employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and

compelling public policy." Id. at 29.

After its creation, a public policy exception has been extended to instances where an employee' termination was motivated by his race (Tate v. Browning-Ferris, Inc., 833 P.2d 1218 (Okla. 1992); age (Saint v. Data Exchange, Inc., 145 P.3d 1037 (Okla. 2006); as a part of sexual harassment (Collier v. Insignia Financial Group, 981 P.2d 321 (Okla. 1999); and attributable to an employee's handicap (Atkinson v. Halliburton, Co., 905 P.2d 772 (Okla. 1995). When originally contemplated prior to the issuance of Burk, the Oklahoma Supreme Court set forth the actionable bases for wrongful discharge as including termination resulting from an employee's (a) refusal to participate in illegal activity; (b) performance of an important public obligation; (c) exercising a legal right or interest; (d) exposure of some wrongdoing by the employer; and (e) performance of an act that public policy would encourage or refusal to do something public policy would condemn, when the discharge is coupled with a showing of bad faith, malice or retaliation. Hinson v. Cameron, 742 P.2d 549, 552-53 (Okla. 1987). The determination of public policy is generally a question of law for the court. Pearson v. Hope Lumber & Supply Co., Inc., 820 P.2d 443, 444 (Okla. 1991).

In this case, Plaintiffs assert a public policy wrongful discharge claim allegedly based upon "the State of Oklahoma's compelling public policy to protect the quality of its air and

14

water from the unreasonable and/or illegal release of harmful environmental emissions by corporate manufacturers operating within the state." Plaintiffs cite to various environmental laws to support this position, including the Oklahoma Environmental Quality Act, Okla. Stat. tit. 27A, § 1 *et seq.* and the Oklahoma Environmental Quality Code, Okla. Stat. tit. 27A, § 2-1-101, *et seq.* and the latter's various subparts, including the Oklahoma Clean Water Act, Oklahoma Pollutant Discharge Elimination System Act, and the Oklahoma Water Supply Systems Act. Plaintiffs also cite to the Environmental Crimes Act, Okla. Stat. tit. 21 § 1230.1, *et seq.* Defendant contends Plaintiffs have failed to identify an actionable, specific public policy established under Oklahoma law. Given that the issue raised by Plaintiffs is one of first impression, a close examination of the requirements for demonstrating a violation of public policy as a matter of law and the specific laws upon which Plaintiffs allegedly derive their relied upon public policy is in order.

One of the most recent pronouncements of the Oklahoma Supreme Court on the parameters of the Burk wrongful discharge claim is represented in the case of Shero v. Grand Savings Bank, 161 P.3d 298 (Okla. 2007). In Shero, the employee alleged he was wrongfully discharged as against public policy for refusing to dismiss a counterclaim in a lawsuit against the employer's customer, allegedly in violation of the Open Records Act. In determining the

Oklahoma Open Records Act did not provide the necessary public policy foundation for a <u>Burk</u> claim, the Oklahoma Supreme Court found

> While the Open Records Act expressly sets forth the public policy concerning the people's right to know and be fully informed about their government, it is silent as to any public policy against conditioning continued employment on the abandonment of claims pursuant to the Act. It is the latter alleged public policy which must be deducible from the Act in order for the Employee to state a claim under the limited <u>Burk</u> tort public policy exception to the at-will doctrine.

<u>Id</u>. at 301 citing <u>Pearson</u>, 820 P.2d at 445.

Similarly, in the earlier <u>Pearson</u> case, an employee attempted to rely upon the Polygraph Examiners Act as the basis for public policy to enable him to pursue a wrongful discharge claim. The Oklahoma Supreme Court found that the Act in question

> does not contain the requisite 'clear mandate of public policy' on which to base a tort for wrongful discharge of an at-will employee under the public policy exception because the Act does not purport to touch any aspect of the employment relationship . . . *The Act does not purport to limit the actions of an employer."*

<u>Pearson</u>, 820 P.2d at 445 (emphasis added by this Court).

Thus, the statute upon which an employee relies for the public policy exception to his at will status must have explicitly state in its provisions an intent to affect the employment relationship.[3] It is against this backdrop that the specific statutory provisions

---

[3] It is settled in this Circuit that no public policy exists in Oklahoma against terminating employees for whistleblowing activity. *See*, <u>Richmond v. ONEOK, Inc.</u>, 120 F.3d 205, 210-211 (10th Cir. 1997). Therefore, Plaintiffs cannot prevail in this action on that generalized basis alone.

16

upon which Plaintiffs rely must be examined.

The Oklahoma Environmental Quality Act has as its stated purposes to

> provide for the administration of environmental functions which will:
>
> 1. Provide that environmental regulatory concerns of industry and the public shall be addressed in an expedient manner;
>
> 2. Improve the manner in which citizen complaints are tracked and resolved;
>
> 3. Better utilize state financial resources for environmental regulatory services; and
>
> 4. Coordinate environmental activities of state environmental agencies.

Okla. Stat. tit. 27A § 1-1-102.

Nothing in the provisions of this Act expresses a public policy to affect an employer's relationship to its employee or may be read to intend to prevent the termination of an employee. As a consequence, this Act cannot form the basis for a public policy exception to the at will employment relationship.

The next identified statute is a type of omnibus environmental statute entitled the Oklahoma Environmental Quality Code. Contained within its provisions is the Oklahoma Clean Air Act. The purpose of this Act is

> to provide the means to achieve and maintain atmospheric purity necessary for the protection and enjoyment of human, plan or animal life and property in this state consistent with and limited by generally accepted social standards and requirements, desired employment and industrial development, area conditions, and the availability of economic and feasible controls.

Okla. Stat. tit. 27A § 2-5-102.

The Act contains enforcement provisions authorizing the ODEQ to issue orders and initiate civil litigation to seek injunctive relief and civil penalties. Okla. Stat. tit. 27A §§ 2-5-110; 2-5-117. This Act also provides for criminal penalties for knowing and willful violations of its terms. Okla. Stat. tit. 27A § 2-5-116. However, a careful review of the provisions of this Act does not reveal any protections for employees involved in the monitoring and reporting of violations of its terms or any intent to affect the employment relationship in any way.

The same may be said for the Oklahoma Water Quality Act as well. This Act's intended purpose is "to provide additional and cumulative remedies to prevent, abate and control the pollution of the waters of the state." Okla. Stat. tit. 27A § 2-6-104. Again, for all its enforcement provisions, it does not purport to protect the interests of employees.

The Oklahoma Pollutant Discharge Elimination System Act cited by Plaintiffs as a basis for a public policy exception in Oklahoma is also deficient in imposing obligations or restrictions upon employers' actions against its employees. The Act establishes a Board to monitor and enforce environmental quality issues and sets out various penalties and permit requirements – but nothing in the employment arena.

The expansive Oklahoma Environmental Quality Code, as a

general piece of legislative expression, is insufficient to establish an Oklahoma public policy goal that is "clear and compelling and articulated in existing constitutional, statutory or jurisprudential law." *See*, <u>Wood v. Handy & Harman Co.</u>, 2006 WL 3228710, 8-9 (N.D.Okla.)(unpublished case) citing <u>Clinton v. State of Okla.</u>, 29 P.3d 543, 546 (Okla. 2001).

The Environmental Crimes Act criminalizes certain conduct surrounding the handling of hazardous waste. This Court perceives no application of this Act to the facts in this case or use of this Act as a basis for an actionable public policy.

Additionally, any suggestion that Defendant terminated Plaintiffs because they refused to engage in illegal activity generally is without foundation. The undisputed facts viewed in a light most favorable to Plaintiffs as the non-moving parties reveals Defendant and its management and supervisory personnel did not require or request that Plaintiffs engage in illegal activity in order to be retained. The general allegations espoused by Plaintiffs in their respective depositions surrounding the workplace environment created by Randy Nebel and the "cumulative effect" of reporting certain environmental issues simply represent Plaintiffs' personal speculation and opinion without an evidentiary basis to support them. Indeed, Plaintiffs' ultimate conclusions that their terminations were based upon their performance of their job duties in reporting environmental matters is ethereal at best.

As a result, this Court finds no legal support for finding that Plaintiffs were terminated in violation of a specifically identifiable and legally recognized public policy under Oklahoma law.

IT IS THEREFORE ORDERED Defendant's Motion for Summary Judgment filed January 25, 2007 (Docket Entry #39) is hereby **GRANTED**. As a result, judgment shall be entered in favor of Defendant Weyerhaeuser Company and against Plaintiffs Elizabeth Martin and Kelly Folsom.

IT IS SO ORDERED this 27th day of September, 2007.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE